**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| TIERA WALKER, | Case No.: 5:26-cv-01578 |
| Plaintiff, | |
| v. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| EQUIFAX INFORMATION SERVICES, LLC | |
| Defendant. | 1.  **FCRA, 15 U.S.C. § 1681,** *et seq.* |

Plaintiff Tiera Walker, ("Plaintiff") through counsel, alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*. against Equifax Information Services, LLC ("Equifax" or "Defendant").

**INTRODUCTION**

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.     Unfortunately, however, this information has also become readily available for, and susceptible to, mishandling and misuse. Individual consumers can, and do, sustain substantial

1

damage, both economically and emotionally, when inaccurate or fraudulent information is disseminated and/or published about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time it sells its credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similarly interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, refinancing, a car or mortgage loan or other forms of credit.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

2

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a **stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home**. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.,* 689 F.2d 72, 79 (6th Cir. 1982) (*quoting* 116 Cong. Rec. 36570 (1970)) (emphasis added).

8.　　In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. 1681(a)(4).

9.　　Plaintiff's Complaint arises out of Defendant's blatantly inaccurate credit reporting, wherein Defendant reported to Plaintiff's potential creditors that Plaintiff owed money on a tradeline that Plaintiff is no longer legally responsible for.

10.　　Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

11.　　As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.,* as described herein.

**JURISDICTION AND VENUE**

12.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant regularly transacts business within this District, is otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

**PARTIES**

14.     Plaintiff is a natural person residing in Cleveland, Ohio, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15.     Defendant Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Upon information and belief, Defendant is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Equifax's principal place of business is located at 1550 Peachtree Street NW, Atlanta, Georgia, 30309. Equifax can be served through its registered agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

16.     Defendant regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Defendant regularly furnishes consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and is therefore  aconsumer reporting agency ("CRA") as defined by 15 U.S.C. § 1681a(f) of the FCRA.

17.     During all times pertinent to this Complaint, Defendant was authorized to conduct business in the State of Ohio and conducted business in the State of Ohio on a routine and systematic basis.

18.     During all times pertinent to this Complaint, Defendant acted through authorized agents, employees, officers, directors, representatives, and/or insurers.

19.     Any violations by Defendant were not in good faith, were knowing, negligent, willful, and/or intentional, and Defendant did not maintain procedures reasonably adapted to avoid any such violations.

20.     Defendant did not maintain procedures reasonably adapted to avoid any such violations.

## FACTUAL BACKGROUND
### Summary of the Fair Credit Reporting Act

21.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

22.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. §1681(a).

23.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with

regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." *See* 15 U.S.C. § 1681(b).

24. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. §1681i).

25. The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with either or both of their statutory obligations under the FCRA.

### Defendant's Processing of Credit Information

26. Defendant, one of the three major CRAs in the United States, regularly publishes and distributes credit information about Plaintiff and other consumers through the sale of consumer reports.

27. Defendant's consumer reports generally contain the following information: (i) Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a

deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

28. Defendant obtains consumer information from various sources. Some consumer information is sent directly to Defendant, and other information must be independently gathered by Defendant, or acquired from third party providers, vendors or repositories, such as computerized reporting services like PACER or Lexis-Nexis.

29. Defendant also obtains information from other CRAs (who commonly share information).

30. Defendant regularly seeks out and procures consumer bankruptcy filing and discharge information on a daily basis with the intention of including it in the consumer reports Defendant sells to third parties for a profit.

31. The diligence Defendant exercises in uncovering and recording consumer bankruptcy filings is not replicated in Defendant's subsequent reporting of bankruptcy discharges and their effect on consumers' debts.

32. The majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from CRAs (like Defendant) to make lending decisions. Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, date of delinquencies contained in Defendant's reports.

33. The information Defendant includes in consumer reports contributes to a consumer's overall creditworthiness and determines his or her FICO Score.

34. FICO and other third-party algorithms use variables or "attributes" derived from a consumer report to calculate a person's "credit score," which is a direct reflection of his or her creditworthiness.

35. FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

    a. "Payment history" refers to whether a consumer has paid his or her bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower a consumer's FICO Score will be.

    b. The "amount of debt" a consumer owes has a major impact on his or her credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA is indicating that a consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact a consumer's credit score.

36. Lenders also consider a consumer's debt-to-income ratio ("DTI") based on the total amount of debt reported by Defendant in its consumer reports. DTI compares the total amount a consumer owes to the total amount a consumer earns.

37. A consumer's income, however, is not included in his or her consumer report; only his or her amount of debt is.

38. Lenders consider a consumer's DTI when deciding whether to approve financing and the credit terms thereof.

39. The higher the amount of reported debt that a consumer has, or appears to have, the worse the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms (e.g., higher interest, lower credit limits).

40. A consumer who has obtained a bankruptcy discharge and has a consumer report that is inaccurately reporting outstanding or past due balances after the bankruptcy discharge suffers greater harm than if that account was accurately reporting as having a zero-dollar balance.

41. Defendant is well aware that the effect of a Discharge Order in a Chapter 7 Bankruptcy is that all statutorily dischargeable debts, other than those that have been reaffirmed or successfully challenged in an adversary proceeding court, are discharged; both such exceptions are rare and furthermore identified on the individual consumer's bankruptcy docket sheet.

42. Additionally, in or around 2009, Defendant implemented its own automated software "bankruptcy scrub" following the settlement agreement in *White v. Experian Info. Sols.*, No. SACV 05-1070 DOC (MLGx), (C.D. Cal. 2008).

43. The *White* settlement makes clear that the CRAs know or should know that pre-petition, unsecured consumer debts are typically discharged in Chapter 7 proceedings. *Benjamin v. Experian Info. Solutions*, 561 F. Supp. 3d 1330, 1340 (citing *Morris v. Experian Info. Sols.*, 478 F. Supp. 3d at 769).

44. Defendant's bankruptcy scrub software identifies pre-petition accounts and makes assumptions about which accounts were discharged through the Chapter 7 bankruptcy, even when the furnisher does not update the accounts as discharged.

9

45.     In other words, Defendant's automated bankruptcy scrub assumes Defendant's notice of a Chapter 7 discharge is in fact notice that a consumer's pre-petition accounts may be reporting inaccurately, and Defendant will overwrite data reported by a furnisher according to its assumptions and algorithms.

46.     However, Defendant has intentionally chosen to disregard knowingly inaccurate open balance and payment obligations of certain types of pre-bankruptcy accounts in Defendant's software programming of its automated "bankruptcy scrub" that it has been employing for well over a decade.

47.     Defendant also knows that it is rare for a pre-petition debt to be reaffirmed, or successfully challenged in an adversary proceeding.

48.     Further, Defendant knows that if reaffirmation agreements or adversary proceedings exist, they will be explicitly identified on an individual consumer's bankruptcy docket, as is required by bankruptcy law.

49.     Additionally, information indicating that a specific debt has not been discharged, but instead was reaffirmed or successfully challenged through an adversary proceeding, is retrieved from the same sources from which Defendant independently obtains consumer bankruptcy case information.

50.     Defendant also receives information about account reaffirmations or other discharge exceptions directly from furnishers of account/tradeline information.

51.     However, Defendant regularly reports inaccurate information about consumers who have received a Discharge Order.

10

52. Rather than follow reasonable procedures to assure maximum possible accuracy, as required by the FCRA, Defendant frequently reports information regarding pre-bankruptcy debts based on incomplete or knowingly inaccurate information.

53. Defendant regularly publishes consumer information that conflicts with information: provided by data furnishers to Defendant, already included in Defendant's credit files, contained in public records that Defendant regularly accesses, and/or sourced through Defendant's independent and voluntary efforts.

54. Defendant's unreasonable policies and procedures cause it to routinely report inaccurate and materially misleading information about consumers, including Plaintiff, who have been discharged from Chapter 7 Bankruptcy.

55. Defendant routinely reports inaccurate, and materially misleading information about consumers like Plaintiff, without verifying or updating the information as required by § 1681e(b), despite possessing information inconsistent with the reported information that establishes the reported information is inaccurate.

56. Defendant's unreasonable policies and procedures cause it to regularly report consumer information without verifying its accuracy.

57. Defendant's unreasonable policies, procedures and/or algorithms consistently fail to identify and update pre-bankruptcy debts as required by § 1681e(b).

58. Defendant knows the information it reports about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in Defendant's own files.

11

59. Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau complaints against Defendant for its inaccurate credit reporting following a Chapter 7 discharge.

60. Thus, Defendant is on continued notice of its inadequate post-bankruptcy reporting procedures, which cause Defendant to report inaccurate balances, account statuses, payment histories, and/or payment statuses.

### Allegations Specific to the Credit Reporting of Plaintiff

61. Plaintiff filed a "no asset" Chapter 7 Bankruptcy on or about September 30, 2025, in the United States Bankruptcy Court for the United States District Court for the Southern District of Ohio (Case No. 25−14276−skk).

62. Plaintiff received an Order of Discharge on or about January 07, 2026.

63. Thereafter, Plaintiff was not personally liable for her dischargeable debts and these debts have a $0 balance after the bankruptcy discharge.

64. Defendant prepared one or more consumer reports concerning Plaintiff after Plaintiff was discharged from Chapter 7 Bankruptcy.

65. Defendant reported Plaintiff's credit history in individual "tradelines," including names of credit accounts, account numbers, account types, responsibility for the account (i.e., individual or joint accounts), the date the accounts were opened, statuses, and the dates of the last status update.

66. However, Defendant failed to report Plaintiff's consumer bankruptcy information in the Public Records section and/or in one or more individual tradelines of Plaintiff's consumer reports.

67. Defendant is aware that CRAs are generally required to report accounts included in a consumer's Chapter 7 bankruptcy with a status of "discharged through bankruptcy," and with a zero-dollar balance, unless a furnisher provides information showing that a specific debt was excluded from the discharge.

68. Defendant should have reported **all** of Plaintiff's dischargeable, pre-petition debts as included in or discharged in Chapter 7 Bankruptcy, and/or with a zero-dollar balance, but did not.

69. Instead, Defendant reported at least one account with an inaccurate account status, payment history, and/or outstanding balance.

### Inaccuracies in Plaintiff's Consumer Report

70. On or about February 19, 2025, Plaintiff obtained a copy of her Equifax credit report.

71. Upon review of her credit report, Plaintiff observed an inaccuracy.

72. As a preliminary matter, Defendant did not indicate that Plaintiff had filed for bankruptcy and received a discharge.

73. The name, social security number, and address in Plaintiff's Chapter 7 petition match the information listed on her Defendant consumer report.

74. Defendant failed to report Plaintiff's bankruptcy discharge even though Defendant had all the correct personal information for Plaintiff in its database which matched the personal information reported in Plaintiff's Chapter 7 petition (e.g., full name, social security number, address).

75. Notably, non-party Experian and non-party TransUnion accurately reported Plaintiff's public record bankruptcy filing and discharge based on the same information.

76. Defendant knew or should have known that Plaintiff's bankruptcy was discharged.

77. On Plaintiff's consumer disclosure, Equifax inaccurately reported Plaintiff's Kikoff Lending account, ending with ******YQFL and opened in October 2021 (the "Kikoff Lending Account"), which pre-dated Plaintiff's bankruptcy filing.

78. The Kikoff Lending Account was discharged on or about January 07, 2026. Therefore, the Kikoff Lending Account should have been reported as discharged in bankruptcy.

79. Equifax inaccurately reported the Kikoff Lending Account with a status of "Charge-Off" and a balance of $74.00 instead of a zero-dollar balance.

80. Therefore, Equifax failed to indicate that the Kikoff Lending Account was discharged in bankruptcy by reporting the pre-bankruptcy Kikoff Lending Account with a status other than "Discharged/Included in Bankruptcy Chapter 7" and/or with a zero-dollar balance.

81. Notably, the other national consumer reporting agencies, Experian and TransUnion, did not inaccurately report the Kikoff Lending Account like Equifax.

82. The status of "Charge-Off" in the consumer credit reporting industry means that a debt may still be owed, especially as here, the tradelines do not include bankruptcy coding such as included in and/or discharged in bankruptcy, or the tradeline indicates there is a balance and/or past due balance owed on the account before or after the "Charge-Off."

83. The national consumer reporting agencies specifically acknowledge that a "Charge-Off" generally means consumers are still legally responsible for paying the debt.

14

84. According to Equifax, a charge-off means that a creditor has determined that an account is unlikely to be collected and has written it off as a loss for accounting purposes.

85. Equifax inaccurately reported the Kikoff Lending Account as a "Charge-Off" after it was discharged in Chapter 7 Bankruptcy and with a balance, instead of a zero-dollar balance.

### Defendant's Unreasonable Procedures

86. Equifax received information from Kikoff Lending (the "Furnisher") indicating that Plaintiff's debt had been included in or discharged through bankruptcy, and/or that the Kikoff Lending Account had a zero-dollar balance following the bankruptcy discharge.

87. Nevertheless, Equifax rejected or otherwise overrode this information.

88. Alternatively, Equifax knew from past experience that Furnisher has furnished inaccurate information regarding discharged debts, or has historically failed to implement reasonable procedures to ensure consumer debts are properly updated after a Chapter 7 bankruptcy.

89. Additionally, upon information and belief, Lexis-Nexis also furnished information to Equifax that indicated Plaintiff had filed for bankruptcy and received a discharge, but Equifax rejected or otherwise failed to report the data it received.

90. Furthermore, public records reflecting Plaintiff's bankruptcy filing and subsequent discharge are readily available to Equifax through multiple sources such as PACER, but Equifax failed to review those sources or knowingly rejected them.

91. Thus, Equifax blindly relied on the information provided by Furnisher, without verifying this information against readily available public records showing Plaintiff's bankruptcy and discharge.

92. Therefore, Equifax's reliance on Furnisher was unreasonable.

15

93.    Equifax's reporting of the Kikoff Lending Account is patently false/incorrect and therefore inaccurate.

94.    If not patently false/incorrect, Equifax's reporting of the Kikoff Lending Account is materially misleading and therefore inaccurate.

## Plaintiff's Dispute

95.    On or about , Plaintiff mailed a certified letter to Defendant disputing the inaccurate reporting in her consumer report prepared by Defendant.

96.    The letter specifically advised Defendant that Plaintiff had filed for Chapter 7 bankruptcy in September 2025 and received a discharge in January 2026 and that her is no longer liable for the discharged debts.

97.    The letter included Plaintiff's name, date of birth, address, bankruptcy case number, and partial Social Security number.

98.    Based on the tracking receipt, Defendant each received Plaintiff's dispute letter.

99.    Upon information and belief, Equifax forwarded Plaintiff's dispute to Kikoff Lending within 5 business days of receipt.

100.    Equifax failed to respond to Plaintiff's dispute.

101.    On May 05, 2026, Plaintiff pulled a new copy of her Equifax report and observed that Equifax was continuing to inaccurately report the Kikoff Lending as charged-off and with a balance of $74.00.

102.    Equifax did not investigate Plaintiff's dispute, and pursuant to its unreasonable procedures, merely forwarded an automated dispute form to Kikoff Lending, despite possessing independent information that indicated the Kikoff Lending Account was discharged.

16

103. Although Equifax could have verified that Kikoff Lending was discharged through the same sources from which it receives consumer bankruptcy information, it neglected to do so.

104. Rather than perform an investigation based on Plaintiff's dispute and reasonably available public records and information known by Equifax, Defendant merely parroted information furnished by Kikoff Lending that indicated the Kikoff Lending Account was not discharged in bankruptcy.

105. Defendant inaccurately reported inaccurate account statuses and/or payment histories.

106. If not patently false, Defendant's reporting of the Kikoff Lending Account is materially misleading and therefore inaccurate.

### Plaintiff's Damages as a Result of Defendant's Report

107. Plaintiff's DTI was negatively affected by Defendant's reporting of debt which Plaintiff does not owe, in turn negatively impacting Plaintiff's credit worthiness.

108. After Plaintiff's bankruptcy discharge, in or around , Plaintiff applied for a credit card with Macys but was denied – due to the aforementioned inaccurate reporting by Equifax.

109. Defendant's inaccurate reporting of the aforementioned account, along with additional information belonging to Plaintiff, was published to potential creditors by Defendant during the process of Plaintiff's credit application.

110. As a direct result of Defendant's inaccurate reporting, Plaintiff suffers damages, including a decreased credit score, lower overall creditworthiness, and other financial harm.

111. Plaintiff sustained actual monetary damages from the expense of mailing a dispute letter via certified mail to Defendant.

17

112. As a direct result of Defendant's inaccurate reporting, Plaintiff also suffers actual damages in the form of attorneys' fees incurred for a necessary review of Plaintiff's credit reports.

113. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, loss of sleep, reputational damage, humiliation, stress, anger, frustration, shock, embarrassment, violation of Plaintiff's right to privacy, and anxiety.

## CLAIMS FOR RELIEF
### COUNT I
### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

114. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

115. The FCRA requires CRAs, like Defendant, to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer information. 15 U.S.C. § 1681e(b).

116. Defendant negligently and/or willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of Plaintiff's credit information pertaining to pre-bankruptcy debts after the consumer, Plaintiff, received a Discharge Order.

117. Defendant knows or should have known that the effect of a Discharge Order in a no asset Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding. Defendant knows or should have known of its obligations under the FCRA, especially pertaining to reporting discharged debt with a zero-dollar balance.

118. These obligations are well established by the plain language of the FCRA, as promulgated by the Federal Trade Commission, detailed in case law, and evidenced in prior cases

involving Defendant from which Defendant is on notice of its unreasonable procedures concerning the reporting of discharged debts.

119. Additionally, Defendant possesses or can easily obtain substantial written materials that detail CRA's duties and obligations under the FCRA, including those that apply when consumers file for Chapter 7 Bankruptcy.

120. Despite knowledge of these legal obligations, Defendant willfully and consciously breached its known duties and deprived Plaintiff of her rights under the FCRA.

121. Defendant knows that discharged debts should not be reported as late, past due, or with outstanding balances after the discharge date, and should be reported with a zero-dollar balance.

122. In this case, Defendant regularly conducts voluntary public records searches with the intention of including bankruptcy information on the consumer report it sells to other parties for a profit.

123. Defendant received notice of Plaintiff's bankruptcy and discharge through public records, independent collection of consumer information directly obtained by Defendant through sources of consumer information such as Lexis-Nexis, Defendant's own files, and information provided by data furnishers, yet Defendant rejected the information.

124. Specifically, Defendant knew or should have known about Plaintiff's bankruptcy filing and discharge and failed to include that information in Plaintiff's consumer disclosure and in consumer reports published to third parties.

125. When Defendant received notice of Plaintiff's bankruptcy information, it had an obligation to ensure it reported Plaintiff's discharge and its effects with maximal accuracy.

19

126.    Defendant received notice of Plaintiff's bankruptcy discharge through public records, its own files, and information provided by data furnishers, yet Defendant failed to report Plaintiff's bankruptcy information.

127.    Defendant's violations of 15 U.S.C. § 1681e(b) were willful.

128.    Alternatively, Defendant's violations of 15 U.S.C. § 1681e(b) were negligent.

129.    Defendant's inaccurate reporting damaged Plaintiff's creditworthiness.

130.    Plaintiff suffers actual damages, including the above-referenced economic damages, a decreased credit score, loss of credit opportunities, credit denial, and other financial harm caused by Defendant inaccurately reporting a balance for a debt that was discharged in bankruptcy, and otherwise failing to report that the debt was discharged in bankruptcy.

131.    Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

132.    Defendant is a direct and proximate cause of Plaintiff's damages.

133.    Defendant is a substantial factor in Plaintiff's damages.

134.    Therefore, Defendant is liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681, *et seq.*

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**

135.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

136.    When a consumer disputes the accuracy or completeness of information included in a CRA's credit file, the FCRA requires the agency to either conduct a reasonable reinvestigation

into the disputed information or delete the disputed information from the consumer's credit file within thirty (30) days of receiving notice of the dispute. 15 U.S.C. § 1681i(a)(2)(A).

137.    When conducting its reinvestigation of disputed information in a consumer report, the consumer reporting agency is required to "review and consider all relevant information submitted by the consumer."

138.    Additionally, the CRA must notify the person who furnished the disputed information of the consumer's dispute within five business days of its receipt. When notifying the furnisher of the consumer's dispute, the CRA is to "include all relevant information regarding the dispute that the agency received from the consumer." 15 U.S.C. § 1681i(a)(2)(A).

139.    Thus, in addition to violating the FCRA by failing to follow reasonable procedures as 15 U.S.C. § 1681e(b) requires, Defendant also violated the FCRA by failing to perform a reasonable reinvestigation of the disputed account even after Plaintiff notified  of the inaccurate information in Plaintiff's credit file.

140.    Defendant's violations of 15 U.S.C. § 1681i include, but are not limited to the following:

   a.   Failing to reasonably reinvestigate the inaccurate information Plaintiff disputed.

   b.   Failing to consider all relevant information while investigating Plaintiff's dispute.

   c.   Failing to include all relevant information when notifying Kikoff Lending of Plaintiff's dispute.

   d.   Instead of reasonably reinvestigating Plaintiff's dispute, Defendant continued to report the Plaintiff's Kikoff Lending Account and public record information inaccurately after Plaintiff's bankruptcy discharge.

141.    Defendant's inaccurate reporting damaged Plaintiff's creditworthiness.

142.     Plaintiff suffers actual damages, including a decreased credit score, loss of credit opportunities, credit denial, and other financial harm caused by Defendant inaccurately reporting a balance for a debt that was discharged in bankruptcy, and otherwise failing to report that the debt was discharged in bankruptcy.

143.    Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

144.    Defendant is a direct and proximate cause of Plaintiff's damages.

145.    Defendant is a substantial factor in Plaintiff's damages.

146.    Defendant's acts, as described above, were done willfully and knowingly; or, alternatively were committed negligently.

147.    Therefore, Defendant is liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681, *et seq*.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i.      Declaratory judgment that Defendant violated the FCRA, 15 U.S.C. § 1681e(b);

ii.     Declaratory judgment that Defendant violated the FCRA, 15 U.S.C. § 1681i;

iii.    An award of actual, statutory, and punitive damages as provided by the FCRA;

iv.     Awarding costs and reasonable attorneys' fees pursuant to FCRA 15 U.S.C. § 1681n(a)(3) and § 1681o(a)(2); and

v.      Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED on July 9, 2026.

/s/ Adam Hubbi
Adam Hubbi, CA #359827
CONSUMER JUSTICE LAW FIRM PLC
8095 N. 85th Way
Scottsdale, AZ 85258
T: (602) 807-1505
F: (480) 613-7733
E: ahubbi@consumerjustice.com

*Attorneys for Plaintiff, Tiera Walker*